1

2

3

4

5

6

7

8

9

10

## UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

11

JOE PRECILIANO FLORES,                     Case No.  1:14-cv-02096-SKO

12
                                           **ORDER ON PLAINTIFF'S SOCIAL**
                    Plaintiff,             **SECURITY APPEAL**
13
          v.

14

CAROLYN W. COLVIN,
15      Acting Commissioner of Social Security,

16                  Defendant.

17      _____

18

19

20                      **I.      INTRODUCTION**

21          Plaintiff, Joe Preciliano Flores ("Plaintiff"), seeks judicial review of a final decision of the

22      Commissioner of Social Security ("Defendant") denying his application for Supplemental Security

23      Income ("SSI") and Disability Income Benefits ("DIB") pursuant to Titles II and XVI of the

24      Social Security Act.  42 U.S.C. §§ 405(g), 1381-83.  The matter is currently before the Court on

25      the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K.

26      Oberto, United States Magistrate Judge.[1]

27      _____

28      [1]   The parties consented to the jurisdiction of a U.S. Magistrate Judge.  (Docs. 7, 8.)

## II.    FACTUAL BACKGROUND

Plaintiff was born on November 22, 1961, and applied for SSI benefits on November 12, 2010, and DIB benefits on December 28, 2011, alleging disability beginning on August 17, 2010. (Administrative Record ("AR") 19; 117-20.)  Plaintiff claims he is disabled due to back problems, memory problems, hip trouble, hernia, and arthritis.  (*See* AR 19; 92; 320.)

**A.    Relevant Medical Evidence**

On November 17, 2009, an MRI of Plaintiff's right knee showed mild tricompartmental osteoarthritis with osteophyte formation, mild lateral patellar subluxation, and internal meniscal degenerations (AR 281-82) and an MRI of his left knee showed slightly less severe tricompartmental osteoarthritis with lateral patellar subluxation and minimal joint fluid (AR 283-84).

On March 8, 2010, Plaintiff reported pain in his right knee worse than in his left knee, with discomfort and multiple episodes of buckling.  (AR 210.)  Dr. Robert Canton, M.D., observed effusion, tenderness, gross palpable crepitus, pain, and a positive McMurray's sign in Plaintiff's right knee.  (AR 210.)  Dr. Canton opined Plaintiff would immediately require an operative arthroscopy with meniscectomy, shaving, and debridement, and would ultimately require total knee replacement.  (AR 210.)

On June 28, 2010, Plaintiff told Dr. James Kraus, M.D., that he was "too scared" to go through with his knee surgery, and reported that he planned to wait to see if the pain became "so bad he will do it."  (AR 266.)  Plaintiff noted pain medication helped with the pain.  (AR 266.) Dr. Kraus observed crepitus in both knees.  (AR 267.)

On September 9, 2010, Plaintiff was seen for pain management of both knees and his lower back and requested a higher dosage of pain medication.  (AR 262.)  On September 29, 2010, nurse practitioner Karen Schaaf, F.N.P., observed Plaintiff was using a cane for ambulation and noted tenderness in the lateral lumbar area with muscle spasm and bilateral knee crepitus and stiffness.  (AR 260.)  On November 4, 2010, NP Schaaf observed tenderness in Plaintiff's lateral lumbar area with muscle spasm, restricted lumbar range of motion secondary to pain, bilateral knee crepitus, and tenderness to palpation in the right knee.  (AR 256.)  On December 27, 2010,

1  Plaintiff told physician assistant Christine Cavanaugh, P.A., that he needed knee replacements but

2  want not going to have them yet.  (AR 253.)

3       On December 13, 2010, NP Schaaf completed a residual functional capacity questionnaire

4  and opined Plaintiff would constantly experience symptoms severe enough to interfere with his

5  ability to attend and concentrate on simple work-related tasks and would require the ability to

6  recline or lie down in excess of typical breaks, to shift positions at will, and to take frequent

7  unscheduled breaks throughout the workday.  (AR 211-12.)  NP Schaaf opined Plaintiff could sit

8  for ten minutes at one time and for two hours total, stand or walk for five minutes at one time and

9  for one hour total in an eight hour workday, and occasionally lift and carry ten pounds or less.

10  (AR 211-12.)  NP Schaaf also opined Plaintiff would likely be absent more than four times per

11  month, could not walk long distances, and had impaired movement due to his physical

12  impairments.  (AR 212.)

13       On March 25, 2011, PA Cavanaugh observed stiffness in the knees when Plaintiff

14  attempted to stand and noted he had to "halt somewhat" until he was able to stand completely

15  erect.  (AR 247.)  Plaintiff told PA Cavanaugh he had to wait until he turned 52 to get knee

16  replacements, as he had been told they only last 10 years.  (AR 247.)  On May 14, 2011, Plaintiff

17  again reported he could not have a knee replacement until he was 52, and PA Cavanaugh observed

18  Plaintiff's knees were quite stiff when he attempted to stand and he "takes a moment to straighten

19  his legs before he can get going."  (AR 244.)

20       On May 17, 2011, Plaintiff reported he was doing well on his Norco for pain relief without

21  side effects, but still had pain.  (AR 242.)  NP Schaaf observed crepitus and pain with movement

22  of both legs.  (AR 243.)  On June 14, 2011, NP Schaaf observed crepitus and restriction with

23  range of motion in both knees.  (AR 240.)  On July 8, 2011, NP Schaaf noted Plaintiff was using a

24  cane to ambulate and observed tenderness in Plaintiff's lateral lumbar area with muscle spasm,

25  restricted lumbar range of motion, and crepitus in Plaintiff's bilateral knees.  (AR 236-37.)

26       On August 10, 2011, Plaintiff reported pain in his knees and back, and NP Schaaf observed

27  tenderness to palpation of Plaintiff's lumbar spine, restricted lumbar range of motion secondary to

28  pain, and crepitus and stiffness with movement.  (AR 233-34.)  Plaintiff indicated his medications

1   enabled him to be mobile.  (AR 233.)  On September 30, 2011, Plaintiff reported one kind of

2   Norco made him drowsy and he requested a different formulation.  (AR 228.)  Plaintiff again

3   reported he was too scared to do the knee surgery.  (AR 228.)  On October 3, 2011, Dr. Anand

4   Magoon, D.O., assessed Plaintiff with chronic pain and lumbago and indicated he was not clear as

5   to why Plaintiff was prescribed chronic narcotics.  (AR 226-27.)  Dr. Magoon also noted Plaintiff

6   was prescribed bupropion (an antidepressant), fluoxetine (an antidepressant), and pravachol

7   (hyperlipidemia).  (AR 227.)

8        On October 13, 2011, Fernando Esparza, P.A., recommended Plaintiff walk or engage in

9   another aerobic activity for thirty minutes, five days per week.  (AR 232.)  On October 20, 2011,

10  associate clinical social worker Sandra Centeno, A.S.W., noted Plaintiff reported chronic pain and

11  was receiving weekly counseling to maintain his sobriety.  (AR 224.)  On November 2, 2011, Dr.

12  Magoon noted lumbar lordosis with muscle spasm and a positive straight leg raise and

13  recommended Plaintiff be placed on Tylenol for his knee pain rather than narcotics.  (AR 402-03.)

14  On November 22, 2011, radiological imaging of Plaintiff's lumbar spine revealed no

15  abnormalities.  (AR 222.)  On December 1, 2011, Plaintiff reported his pain without medication

16  was a 10/10 and with medication was a 5/10.  (AR 218.)  As his back x-rays had not shown any

17  structural abnormalities, Dr. Magoon began to taper Plaintiff off Vicodin.  (AR 219.)

18       On January 3 2012, Dr. Magoon assessed Plaintiff as suffering from "backache

19  unspecified" and noted Plaintiff was attending counseling and receiving methadone for previous

20  drug addiction.  (AR 213-14; 216-17.)  On January 16, 2012, NP Schaaf noted Plaintiff was

21  positive for moderate depression and degenerative arthritis of the knee.  (AR 397-98.)  On

22  February 2, 2012, NP Schaaf observed Plaintiff used a cane for ambulation and had decreased

23  range of motion and pain in his back and knees with movement. (AR 313; 394.)  On March 1,

24  2012, NP Schaaf noted Plaintiff was in mild pain, had an irregular heart rhythm, and exhibited

25  decreased range of motion and pain in his bilateral knees, and prescribed Plaintiff a refill of

26  Hydrocodone for the pain.  (AR 309-10; 386-87.)

27       On March 19, 2012, consultative examiner Dr. Roger Wagner, M.D., saw Plaintiff for a

28  comprehensive internal medicine evaluation.  (AR 285.)  Plaintiff reported epilepsy since grammar

school due to head trauma (though he had not had a seizure in two or three years and had ceased taking seizure medication), and bilateral knee arthritis, with occasional feelings that his knees "are going to 'give out on him.'"  (AR 285.)  Plaintiff stated he cannot climb stairs and can walk about one block before becoming "too tired."  (AR 285.)  Plaintiff reported using a cane "at times" but "appeared to be stable walking without the cane" at the examination.  (AR 286.)

Plaintiff reported living with his wife and minor daughter, doing "light cooking and cleaning," shopping, performing "his own activities of daily living," and walking for exercise.  (AR 286.)  Dr. Wagner observed Plaintiff was able to easily rise from his chair, sit comfortably, bend at the waist easily, and take his shoes on and off without difficulty, and noted that although Plaintiff carried a cane, he did not appear to lean on it heavily.  (AR 286.)  Dr. Wagner also observed a moderate amplitude tremor in Plaintiff's right hand, some minimal knee swelling, and +1 crepitus in both knees.  (AR 288.)

Dr. Wagner opined Plaintiff was capable of standing and walking up to six hours and had no limitation on his ability to sit; could lift or carry 50 pounds occasionally and 25 pounds frequently; could never climb or balance on ladders or scaffolds or work around heights or heavy machinery; may be able to climb stairs with good railings; had no significant limitations on manipulation, though fine fingering on his right hand would be impaired due to his tremor; and, that use of a cane "may be necessary for long distances."  (AR 289.)

On March 26, 2012, consultative examiner Dr. Aparna Dixit, Psy. D., saw Plaintiff for a comprehensive psychiatric evaluation.  (AR 290-93.)  Plaintiff reported he had suffered from seizures as a child, that his seizures had re-started one to one and a half years ago, and denied a history of head injury.  (AR 290-91.)  Plaintiff described his daily activities as staying mostly at home with a limited ability to perform household chores, but he could dress and bathe himself.  (AR 291.)  Dr. Dixit observed Plaintiff presented with a depressed mood and noted Plaintiff could not name the current president, could not perform serial sevens, could not spell the word "world" forward or backward, and could not interpret a proverb.  (AR 292.)  However, Dr. Dixit opined Plaintiff had no significant impairment in his mental functioning.  (AR 293.)  Dr. Dixit concluded Plaintiff is capable of performing "simple and repetitive tasks on a regular basis," his "ability to

1  perform detailed and complex tasks is not significantly impaired," he "should have no significant
2  difficulty working with supervisors, coworkers, and the public" or "handling routine stressors,"
3  and he would benefit from assistance in managing his funds due to a history of substance abuse.
4  (AR 293.)

5      On April 16, 2012, state agency consultant Dr. R. Fast, M.D., opined Plaintiff's seizure
6  impairment was non-severe, as his seizures had stopped and he no longer needed medication, he
7  had no limitations from his mild tremor, and that medium work was appropriate given the arthritis
8  in his knees and normal gait, strength, range of movement, and stability.  (AR 294-96.)  Dr. Fast
9  opined Plaintiff could lift or carry 50 pounds occasionally and 25 pounds frequently; could sit,
10  stand, and walk six hours in an eight-hour day; and had no postural, manipulative, or
11  environmental limitations.  (AR 297-301.)

12      On March 29, 2012, NP Schaaf observed Flores appeared to be in mild pain and had
13  decreased range of motion in his bilateral knees and provided a refill of Norco for pain.  (AR 307;
14  384.)  On April 26, 2012, NP Schaaf noted Plaintiff appeared to be in mild pain, had decreased
15  range of motion with pain in his left knee, and used a cane for ambulation.  (AR 304; 381.)  NP
16  Schaaf refilled Plaintiff's prescription for Norco and ordered a Depo Medrol knee injection.
17  (AR 305.)

18      On June 20, 2012, NP Schaaf completed a second residual functional capacity
19  questionnaire, opining Plaintiff required a cane for ambulation and experienced pain with bending
20  or standing too long.  (AR 345.)  NP Schaaf also opined Plaintiff would constantly experience
21  symptoms severe enough to interfere with his ability to attend and concentrate on simple work-
22  related tasks and would require the abilities to recline or lie down in excess of typical breaks, to
23  shift positions at will, and to take unscheduled breaks multiple times throughout the workday.
24  (AR 345.)  NP Schaaf opined Plaintiff could sit for five minutes at one time and for zero hours
25  total in an eight-hour workday, could stand or walk for ten minutes at one time and for zero hours
26  total in an eight-hour workday, and could never lift any weight.  (AR 345-46.)  NP Schaaf also
27  opined Plaintiff would likely be absent more than four times per month due to his symptoms.
28  (AR 346.)

On July 30, 2012, physician assistant Brian Cormier, P.A., observed Plaintiff's gait was slowed and affected by a limp, his knee pain was "stable and nonprogressive," and he exhibited pain with flexion and extension in his back. (AR 377-78.)  PA Cormier opined Plaintiff should avoid kneeling and squatting.  (AR 379.)

On August 2, 2012, state agency consultant Dr. L. Kiger, M.D., reviewed the record and concluded there were "no new findings to support the necessity for a cane" and adopted a medium residual functional capacity assessment and non-severe psychiatric review technique form findings.  (AR 347-48.)  On August 7, 2012, state agency consultant Dr. Evangeline Murillo, M.D., agreed that Plaintiff's medical impairments were non-severe and noted there was no evidence of worsening of Plaintiff's condition on reconsideration.  (AR 351-52.)  On August 8, 2012, Dr. Kiger reviewed NP Schaaf's December 2010 and June 2012 residual functional capacity questionnaires, noted they were consistent with the previously reviewed February 2010 questionnaire, and assigned them reduced weight as they also were "not consistent with treatment notes or the record as a whole."  (AR 349-50.)

On August 30, 2012, NP Schaaf observed Plaintiff was in mild pain, had an irregular heart rhythm, a limping gait, used a cane for ambulation, and had pain with range of motion in his left knee, and refilled Plaintiff's Norco prescription for pain. (AR 375.)  NP Schaaf noted Plaintiff's symptoms were "progressive and worsening" and his discomfort was "moderate in severity." (AR 374.)  On September 27, 2012, NP Schaaf again observed a limping gait, use of a cane, and decreased range of motion with pain in Plaintiff's left knee.  (AR 371.)  On October 12, 2012, Dr. Krishnamoorthi Krishnamoorthi, M.D., noted Plaintiff was in mild pain, had a limping gait, and walked with use of a cane and refilled Plaintiff's Norco prescription.  (AR 368.)  On December 17, 2012, NP Schaaf noted Plaintiff was in mild pain and exhibited decreased range of motion with pain in his bilateral knees, and provided a refill of Norco.  (AR 365.)

On March 16, 2013, PA Cormier observed Plaintiff walked with a slowed gait and complained of severe, rapidly worsening knee pain and stiffness.  (AR 360.)  PA Cormier noted Plaintiff had tried Hydrocodone with "some relief," had tried massage, diathermy, and meditation with "poor results," and had seen a chronic pain specialist with "mixed effectiveness."  (AR 360.)

7

1   On examination, Plaintiff had a slow gait and noted pain with range of motion in his back and

2   knees.  (AR 361.)  PA Cormier provided a refill of Norco for pain and opined Plaintiff should

3   avoid kneeling, squatting, and weight-bearing and should reconsider knee surgery.  (AR 362.)

4           On April 6, 2013, Dr. Krishnamoorthi completed a residual functional capacity

5   questionnaire.  (AR 399-400.)  Dr. Krishnamoorthi described Plaintiff's symptoms as "pain with

6   active [range of motion] of his joints" and opined Plaintiff would constantly experience symptoms

7   severe enough to interfere with his ability to attend and concentrate on simple work-related tasks.

8   (AR 399.)  Dr. Krishnamoorthi further opined Plaintiff could walk a half a city block, maximum,

9   without rest or significant pain, could sit for five minutes at one time and for one hour total in an

10  eight-hour day, and could stand or walk for five minutes at one time and for one hour total in an

11  eight-hour day.  (AR 399.)  Dr. Krishnamoorthi opined Plaintiff would require the abilities to

12  recline or lie down in excess of typical breaks, to shift positions at will, and to take unscheduled

13  breaks throughout the workday.  (AR 399.) Dr. Krishnamoorthi opined Plaintiff could only

14  occasionally lift and carry lift less than ten pounds and was limited to using his hands, arms, and

15  fingers for 70 percent of the workday.  (AR 400.)  Dr. Krishnamoorthi concluded that Plaintiff

16  would likely be absent more than four days per month.  (AR 400.)

17  **B.      Written Reports**

18          **1.      Plaintiff's Work History Report**

19          Plaintiff received his GED in January of 1985 (AR 143) and worked as a maintenance man

20  and "bell-boy" from 1998 to 2003 (AR 138).  His duties included picking up laundry, painting,

21  and repairing damaged lighting fixtures and shades.  (AR 138.)  He lifted up to 100 pounds,

22  frequently lifted less than ten pounds, walked and stood three hours in an eight-hour workday, and

23  sat two hours in an eight-hour workday.  (AR 138.)  Plaintiff also has work experience as an

24  industrial groundskeeper, Dictionary of Occupational Titles ("DOT") 406.684-014, performed as

25  medium; as a "Hod carrier," DOT 869.687-026 (construction worker II), performed as very heavy;

26  and as a construction worker I, DOT 869.664-014, performed as heavy.  (AR 209.)

27  //

28  //

**2.     Plaintiff's Adult Function Reports**

On January 31, 2012, Plaintiff and his wife completed an adult function report, noting that on an average day he spends most of the day lying down after waking up, and only gets up to eat breakfast, speak on the telephone, and go to the bathroom.  (AR 152.)  He is "in pain all day all night all the time" (*sic*).  (AR 153.)  He does not have difficulties with his personal care, but dresses slowly and has to "be careful" when bathing to avoid falling.  (AR 153; 155.)  He does not prepare his own meals, do chores, or do yardwork and he relies on his wife to remind him to take his medication and take care of his personal needs and grooming.  (AR 154.)  He does not socialize or visit with friends and family.  (AR 156.)

Plaintiff has difficulty lifting, walking, squatting, bending, kneeling, standing, reaching, climbing stairs, seeing, completing tasks, and recalling.  (AR 157.)  He is unable to pay attention for long and cannot follow written or spoken instructions very well.  (AR 157.)  He was "told to get a cane by [his] doctor" and uses a cane "all the time," but also notes he was not prescribed a cane by a physician.  (AR 158.)

On July 12, 2012, Plaintiff completed a second adult function report, noting he continues to spend most of the day lying down and gets up only to shower and shave, take his medication, sit down to eat meals or snacks, smoke a cigarette, or use the restroom.  (AR 178.)  He reports that it takes him longer to dress and bathe and that he has more difficulty "get[ting] up or down" from the toilet.  (AR 179.)  He continues to rely on his wife to remind him to shower and take his medication.  (AR 180.)  He does not cook for himself because he forgets and leaves the burner on and he does not go outside because he is afraid of falling.  (AR 180-81.)  He will occasionally talk to people on the phone or when they come to visit and he goes to church once a month.  (AR 182.) He lists difficulties with lifting, walking, squatting, sitting, bending, kneeling, standing, climbing stairs, memory, completing tasks, concentrating, understanding, following instructions, and getting along with others.  (AR 183.)  He reports that he purchased a cane because his physician "told [him] to buy one because [he] ke[pt] grabbing on everything" to balance.  (AR 184.)

//

//

### 3. Third-Party Adult Function Reports

On February 22, 2012, Plaintiff's cousin Dee-Dee Robles completed a third-party adult function report, noting Plaintiff is unable to "do anything . . . because of the pain he has [i]n h[i]s legs and back." (AR 160.)  Ms. Robles noted that Plaintiff will re-wear clothing unless someone tells him to change, will not eat unless someone prepares the meal for him, and has difficulty lifting his legs to get in and out of the bathtub.  (AR 161.)  He needs reminders to take his medication and "doesn't do anything, for himself or anyone[,]" "[be]cause he's in pain." (AR 162.)  Plaintiff is unable to go out alone because "he's stupid" and "he doesn't care anymore."  (AR 163.)  He does not shop, instead "people give him his stuff."  (AR 163.) "Because of the pain, he hates everything [and] everybody," and spends most of his time alone at home, watching television.  (AR 163-65.)  Ms. Robles indicated that Plaintiff is limited in every category of abilities, except "seeing" (AR 165) and stated that Plaintiff "thinks the whole world is against him since he lost his son and his legs don't work anymore.  He falls a lot [and] he can't be around a lot of people" (AR 167).

On July 13, 2012, Plaintiff's friend and former employer James Winchell completed a third-party adult function report, noting that he was forced to terminate Plaintiff's employment due to his bad knees.  (AR 186-87.)  He noted Plaintiff was limited in his ability to lift, squat, bend, stand, reach, walk, kneel, and climb stairs because "he has lost all strength in both knees." (AR 191.)  Mr. Winchell noted Plaintiff can pay attention "through out (*sic*) the whole conversation" and follows both written and spoken instructions "very well." (AR 191.)  He also reported seeing Plaintiff using crutches, a walker, a cane, and a wheelchair at various points of time.  (AR 192.)

## C.   Hearing Testimony

### 1.   Plaintiff's Testimony

Plaintiff testified he is married and lives with his spouse and two children.  (AR 413-14; 417.)  He last worked for Days Inn in 2004 as a maintenance man / "all-around handyman." (AR 414.)  Plaintiff stopped working because his "legs were hurting [him] real bad" and has not worked since because his "knees are real bad and [his] feet hurt on the bottom."  (AR 414-15.)

1   Plaintiff also has arthritis pain in his hands, elbows, and legs.  (AR 416.)  He takes Norco,

2   Hydrocodone, and other pain medication to treat his pain and Glucosamine, calcium, and Vitamin

3   D for his arthritis. (AR 416.)

4        On a typical day, Plaintiff sits on his porch, eats meals, watches television, and "stay[s]

5   pretty close to [his] bed" to take three or four naps lasting one and a half to two hours. (AR 417.)

6   He occasionally goes shopping with his wife and is able to walk about fifteen minutes to go to his

7   mailbox. (AR 417.)  Plaintiff does not require assistance in bathing or dressing and has no trouble

8   using his hands for pushing buttons. (AR 419; 421.)  He does, however, have difficulty with his

9   fingers "get[ting] stuck" about once a day, where he is unable to flex them. (AR 421.)  When that

10  happens, he has to rub his arms and hands for five to ten minutes until they relax. (AR 421.)  He

11  cannot stand very long, and while he doesn't have "very much" trouble sitting, his legs will start

12  hurting and "go to sleep" unless he is able to "shake [his] legs out, get it going." (AR 417.)

13  Plaintiff is most comfortable lying in bed, and spends six to eight hours laying down each day on

14  his back. (AR 423-24.)  He is unable to roll on his side because his knees will lock. (AR 424.)

15  He had seizures when he was a child, but no longer takes medication for seizures and is unable to

16  recall the last time he had a seizure. (AR 418-19.)

17       Plaintiff smokes a pack of cigarettes every three days, and has a history of heroin and

18  cocaine use. (AR 420.)  Plaintiff went to a rehabilitation program and has not used either in the

19  past twenty years. (AR 420.)  He continues to go to Narcotics Anonymous once a week for

20  ongoing support. (AR 420-21.)

21       Plaintiff testified his treating physician sent him for a surgical consultation for a knee

22  replacement but Plaintiff "told them I don't want to replace my knees right now, because they said

23  it's only a ten-year period thing or whatever that the knee things last.  So, I wanted to wait until I

24  got a little older.  And, besides that, I'm kinda scared too." (AR 415.)

25       **2.     Vocational Expert Testimony**

26       The Vocational Expert ("VE") testified that Plaintiff had past relevant work as a

27  construction worker, DOT 869.664-014, heavy, semi-skilled work with an SVP[2] of 4, as a

28  _____

    [2]    Specific Vocational Preparation ("SVP"), as defined in DOT, App. C, is the amount of lapsed time required by a

1   groundskeeper, DOT 405.684-014, medium, semi-skilled work with an SVP of 3, and as a counter

2   attendant for a cafeteria, DOT 311.677-014, light, semi-skilled work with an SVP of 3.  (AR 425.)

3       The ALJ asked the VE to consider an individual approaching advanced age, with a GED

4   and Plaintiff's past relevant work, limited to lifting 50 pounds occasionally and 25 pounds

5   frequently, able to stand and walk in combination for at least six hours in a workday, able to sit at

6   least six hours in a workday, perform postural activities frequently, prohibited from climbing

7   ladders, ropes, and scaffolds, prohibited from working at heights or around hazardous machinery,

8   and limited to work involving simple instructions.  (AR 426.)  The VE testified such an individual

9   would not be able to perform any of Plaintiff's past relevant work, but could perform other

10  representative jobs such as a kitchen helper, DOT 318.687-010, medium, unskilled work with an

11  SVP of 2; laundry worker, DOT 361.685-018, medium, unskilled work with an SVP of 2; and

12  cleaner, DOT 919.687-014, medium, unskilled work with an SVP of 1.  (AR 426.)

13      The ALJ then asked the VE to consider an individual of the same age, education, and

14  vocational background, capable of lifting 15 pounds frequently and 25 pounds occasionally,

15  capable of walking, standing, and sitting six hours in a workday, with the same non-exertional

16  limitations as the first hypothetical but requiring "less than occasional contact" with coworkers

17  and the public.  (AR 427.)  The VE testified that such a limitation would eliminate kitchen worker,

18  but would not eliminate the occupations of laundry worker or cleaner.  (AR 427.)  The ALJ asked

19  if the VE's testimony was consistent with the DOT and the VE testified that it was.  (AR 427.)

20      Plaintiff's attorney then asked the VE whether an individual who was limited to sedentary-

21  type work would have transferable skills for his past relevant work, and the VE testified he would

22  not.  (AR 427.)  Plaintiff's attorney asked the VE if an individual who would miss three to four

23  days of work each month on an ongoing and continuous basis would be able to sustain full-time

24  work, and the VE testified that such a limitation would "totally eliminate all jobs in the national

25  economy."  (AR 427-28.)  Plaintiff's attorney asked if an individual requiring extra breaks that

26  totaled up to 50 percent of the day, on top of normally scheduled breaks, would be able to sustain

27  _____

28  typical worker to learn the techniques, acquire the information, and develop the facility needed for average
    performance in a specific job-worker situation.

1   full-time work, and the VE testified such a person could not work.  (AR 428.)  Plaintiff's attorney

2   finally asked if any jobs existed for an individual needing to recline or lie  down throughout the

3   day in excess of normal breaks and lunch periods, and the VE testified no such jobs existed.

4   (AR 428.)

5   **D.      Administrative Proceedings**

6         On June 28, 2013, the ALJ issued a decision and determined Plaintiff was not disabled.

7   (AR 19-33.)  The ALJ found Plaintiff had severe impairments of degenerative disc disease of the

8   lumbar spine, osteoarthritis, and obesity, but did not have an impairment or combination of

9   impairments meeting or equaling a listed impairment.  (AR 21-24.)  The ALJ found Plaintiff

10  retained the residual functional capacity ("RFC") to perform medium work as defined in 20 CFR

11  § 416.967(c) except "he can lift 50 pounds occasionally, 25 pounds frequently.  He can stand and

12  walk in combination for at least six hours in an eight-hour workday, and sit at least six hours in a

13  workday.  He can perform postural activities frequently, but should not climb ladders, ropes or

14  scaffolding, and should not work around heights or hazardous machines.  He is limited to work

15  involving simple instructions."  (AR 24.)

16        Given this RFC, the ALJ found Plaintiff was unable to perform his past relevant work as a

17  construction worker, Hod carrier, and groundskeeper, as Plaintiff had performed this work "at a

18  more demanding exertional level than that which he is now capable of performing."  (AR 32.)

19  The ALJ found Plaintiff could perform other work, including representational occupations of

20  kitchen helper, DOT 318.687-010; laundry worker, DOT 361.685-018; and cleaner, DOT

21  919.687-014.  (AR 32-33.)  The ALJ concluded Plaintiff was not disabled, as defined in the Social

22  Security Act, from November 12, 2010, the date the application was filed, to the date of the

23  decision.   (AR 33.)   This decision became the final decision of the Commissioner when the

24  Appeals Council denied Plaintiff's request for review on October 30, 2014.  (AR 6-8.)

25  **E.      Plaintiff's Complaint**

26        On December 31, 2014, Plaintiff filed a complaint before this Court seeking review of the

27  ALJ's decision.  (Doc. 1.)  Plaintiff argues the ALJ's RFC assessment was unsupported by the

28  medical opinion evidence, the hypothetical posed to the VE was incomplete, and the ALJ

1  erroneously discounted Plaintiff's credibility.  (Doc. 17.)

2  <center>**III.   SCOPE OF REVIEW**</center>

3  The ALJ's decision denying benefits "will be disturbed only if that decision is not
4  supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599,
5  601 (9th Cir. 1999).  In reviewing the Commissioner's decision, the Court may not substitute its
6  judgment for that of the Commissioner.  *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996).
7  Instead, the Court must determine whether the Commissioner applied the proper legal standards
8  and whether substantial evidence exists in the record to support the Commissioner's findings.  *See*
9  *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).

10  "Substantial evidence is more than a mere scintilla but less than a preponderance." *Ryan v.*
11  *Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).  "Substantial evidence" means "such
12  relevant evidence as a reasonable mind might accept as adequate to support a conclusion."
13  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*,
14  305 U.S. 197, 229 (1938)).  The Court "must consider the entire record as a whole, weighing both
15  the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and
16  may not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v.*
17  *Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

18  <center>**IV.   APPLICABLE LAW**</center>

19  An individual is considered disabled for purposes of disability benefits if he is unable to
20  engage in any substantial, gainful activity by reason of any medically determinable physical or
21  mental impairment that can be expected to result in death or that has lasted, or can be expected to
22  last, for a continuous period of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A),
23  1382c(a)(3) (A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003).  The impairment or
24  impairments must result from anatomical, physiological, or psychological abnormalities that are
25  demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of
26  such severity that the claimant is not only unable to do his previous work, but cannot, considering
27  his age, education, and work experience, engage in any other kind of substantial, gainful work that
28  exists in the national economy.  42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

<center>14</center>

1    The regulations provide that the ALJ must undertake a specific five-step sequential

2  analysis in the process of evaluating a disability.  In Step 1, the ALJ must determine whether the

3  claimant is currently engaged in substantial gainful activity.   20 C.F.R. §§ 404.1520(b),

4  416.920(b).   If not, the ALJ must determine at Step 2 whether the claimant has a severe

5  impairment or a combination of impairments significantly limiting her from performing basic

6  work activities.  *Id.* §§ 404.1520(c), 416.920(c).  If so, the ALJ moves to Step 3 and determines

7  whether the claimant has a severe impairment or combination of impairments that meet or equal

8  the requirements of the Listing of Impairments ("Listing"), 20 § 404, Subpart P, App. 1, and is

9  therefore presumptively disabled.  *Id.* §§ 404.1520(d), 416.920(d).  If not, at Step 4 the ALJ must

10  determine whether the claimant has sufficient RFC to perform her past work despite the

11  impairment or various limitations.  *Id.* §§ 404.1520(f), 416.920(f).  If not, at Step 5, the burden

12  shifts to the Commissioner to show that the claimant can perform other work that exists in

13  significant numbers in the national economy.  *Id.* §§ 404.1520(g), 416.920(g).  If a claimant is

14  found to be disabled or not disabled at any step in the sequence, there is no need to consider

15  subsequent steps.  *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. §§

16  404.1520, 416.920.

## V.   DISCUSSION

18    Plaintiff argues that the ALJ's residual functional capacity ("RFC") assessment was not

19  supported by substantial evidence, the ALJ erroneously relied upon VE testimony based on an

20  incomplete hypothetical, and the ALJ failed to provide legally sufficient reasons for discounting

21  Plaintiff's credibility.  (Doc. 17.)

22  **A.    The ALJ's Consideration of Plaintiff's Testimony**

23    Plaintiff contends the ALJ failed to articulate clear and convincing reasons for discounting

24  his statements regarding the severity and extent of his symptoms.  (Doc. 17, pp. 16-20.)  The

25  Commissioner asserts the ALJ properly evaluated Plaintiff's testimony.  (Doc. 18, pp. 7-12.)

26    In evaluating the credibility of a claimant's testimony regarding subjective pain, an ALJ

27  must engage in a two-step analysis.  *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009); *Bunnell*

28  *v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc).  First, the ALJ must determine whether

1    the claimant has presented objective medical evidence of an underlying impairment that could

2    reasonably be expected to produce the pain or other symptoms alleged.  *Vasquez*, 572 F.3d at 591.

3    The claimant is not required to show that his impairment "could reasonably be expected to cause

4    the severity of the symptom [he] has alleged; he need only show that it could reasonably have

5    caused some degree of the symptom."  *Id.* (quoting *Lingenfelter*, 504 F.3d at 1036).   If the

6    claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the

7    claimant's testimony about the severity of the symptoms if she gives "specific, clear and

8    convincing reasons" for the rejection.  *Id.*

9         The ALJ also may consider (1) the claimant's reputation for truthfulness, prior inconsistent

10   statements, or other inconsistent testimony, (2) unexplained or inadequately explained failure to

11   seek treatment or to follow a prescribed course of treatment, and (3) the claimant's daily activities.

12   *Tommasetti*, 533 F.3d at 1041; *see also Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1226-

13   27 (9th Cir. 2009); *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996); 20 C.F.R. §§ 404.1529,

14   416.929.   "If the ALJ's finding is supported by substantial evidence, the court may not engage in

15   second-guessing."  *Tommasetti*, 533 F.3d at 1039.

16        Here, the ALJ provided several reasons for finding Plaintiff less than fully credible.   The

17   ALJ concluded that Plaintiff's subjective pain testimony was inconsistent with the objective

18   medical evidence and observations of treating medical professionals.  (AR 28.)  While the lack of

19   objective medical evidence supporting Plaintiff's pain testimony cannot form the sole basis for

20   discounting his allegations, it is clearly a factor the ALJ may consider in his credibility analysis.

21   *See Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005).   Here, the ALJ pointed to substantial

22   medical evidence within the medical record, including contradictory clinical observations and

23   notes by treating sources and examining physicians, to support his conclusion that Plaintiff's

24   testimony was less than fully credible.   The ALJ noted that Plaintiff

25
       … denied neck or back pain on January 27, 2010[,] [and on] February 27, 2010,
       April 29, 2010, [and] July 8, 2010, [Plaintiff] denied back or neck pain.   He
26     reported back pain on September 7, 2010.  On September 29, 2010, [Plaintiff]'s
       lumbar spine had normal range of motion, and was noted to be stable, but spasm
27     was noted.  He reported back pain on November 4, 2010.  Range of motion was
       restricted, but his back was stable.  Medication did help.  [Plaintiff] reported back
28

1    pain on November 2, 2011.  He said no imaging studies had been done.  His
     lumbar spine was nontender.  Range of motion was normal.  The impression was
2    that his lumbar spine was stable.  He had normal tone, bulk and strength.  X-rays
     were ordered.  A lumbar spine x-ray dated November 22, 2011 was negative.  On
3    December 1, 2011, chart notes state that "x-rays of back do not show any
     structural abnormalities, so will taper [patient] off Vicodin, starting with this rx,
4    #90; [patient] agrees/understands plan."

5    (AR 27 (internal citations omitted).)  The ALJ further observed that Plaintiff

6    . . . was in no distress on January 27, 2010, despite reporting 8/10 pain.  He was in
     no acute distress on July 8, 2010.  On September 7, 2010, he reported having
7    terrible pain, but also said he was doing okay, and he was in no acute distress.  On
     December 27, 2010, [Plaintiff] rated his pain as 8/10, but he was in no acute
8    distress and said pain medication helped.  His pain was 10/10 on April 4, 2011,
     yet he was in no acute distress.  He reported 8/10 pain on April 22, 2011, but was
9    in no acute distress and medications were simply refilled.  On May 17, 2011, and
     July 8, 2011, he said he was doing well on pain medication without side effects.
10   On December 1, 2011, [Plaintiff] said his pain was 10/10 without medication and
     5-7/10 with it.  He was in no distress.
11

12   (AR 28 (internal citations omitted).)

13       Plaintiff contends the ALJ "blatantly ignore[d] the many objective observations of pain

14   and decreased range of motion in [Plaintiff's] back and knees, difficult ambulating, and use of a

15   cane[.]"   (Doc. 17, p. 18.)   However, a review of the medical evidence notes only mild

16   impairments: an MRI of Plaintiff's right knee showed mild tricompartmental osteoarthritis with

17   osteophyte formation, mild lateral patellar subluxation, and internal meniscal degenerations and an

18   MRI of his left knee showed slightly less severe tricompartmental osteoarthritis with lateral

19   patellar subluxation and minimal joint fluid.  (AR 281-82; 283-84.)   Radiological imaging of

20   Plaintiff's lumbar spine showed no abnormalities.  (AR 222.)  Plaintiff was repeatedly observed to

21   be in "mild" pain (*see, e.g.,* AR 304; 307; 309-10; 368; 375), to have a normal gait, no knee joint

22   instability, and normal strength, bulk, and tone (*see, e.g.,* AR 27; 210; 247; 253; 403; 415), to be

23   "doing well" on his medications (*see, e.g.,* AR 233; 242), and his knee pain was considered "stable

24   and nonprogressive" (*see, e.g.,* AR 377-78).   When Plaintiff did report high levels of pain,

25   however, he was repeatedly observed not to be in any acute distress and his muscoskeletal

26   findings were repeatedly observed to be "normal."  (*See*, *e.g.*, AR 218; 242-43; 244; 247; 253;

27   260; 264; 266; 279.)   The ALJ properly pointed to the lack of objective medical evidence

28   supporting Plaintiff's allegations of disabling pain, in part, in discounting Plaintiff's credibility.

1  *See Burch*, 400 F.3d at 681; *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001).

2        The ALJ also noted that

3        . . . [o]n two occasions, treating doctors have indicated that the narcotic pain
4        medication prescribed to [Plaintiff] was not necessary or [was] excessive.  On
         November 2, 2011, he was told that he would get "no more narcotics[.]"   On
5        December 1, 2011, chart notes state that "x-rays of back do not show any
         structural abnormalities, so will taper [patient] off Vicodin, starting with this
6        [prescription], #90; [patient] agrees/understands plan[.]"

7  (AR 28 (internal citations omitted).)   Plaintiff contends that the ALJ's summary of the record is

8  "highly misleading and not wholly accurate[,]" because the ALJ noted that on two occasions

9  "treating doctors" made these observation despite that only Dr. Magoon made "any statements

10 expressing skepticism as to why [Plaintiff] was prescribed narcotics and he never explicitly

11 indicated that the reason was because they were excessive or otherwise unnecessary."  (Doc. 17, p.

12 19 (citing AR 219; 227).)   The Court declines to parse the ALJ's phrasing as Plaintiff does, to hold

13 that the ALJ meant that on two occasions, different treating physicians indicated Plaintiff's use of

14 narcotic pain medications was unnecessary.   The ALJ unambiguously cited the dates of treatment

15 and the record citations where that treatment was recorded; it is clear the ALJ meant that on two

16 different occasions, one of Plaintiff's treating physicians -- Dr. Magoon -- opined that Plaintiff's

17 use of narcotic pain medications was unnecessary.

18      An ALJ's credibility finding may be based upon "ordinary techniques" of credibility

19 evaluation, including inconsistent statements, *Smolen*, 80 F.3d at 1284, and this Court must affirm

20 "inferences reasonably drawn from the record."  *Batson v. Comm'r Soc. Sec.*, 359 F.3d 1190, 1193

21 (9th Cir. 2004).  Here, the ALJ acknowledged that Plaintiff sought and repeatedly used narcotic

22 pain medication (*see* AR 24-32), but found it inconsistent with treating physician Dr. Magoon's

23 opinion that Plaintiff's knee pain would be adequately addressed by Tylenol rather than narcotics

24 and Dr. Magoon's treating record of beginning to taper Plaintiff off Vicodin as unnecessary.

25 (AR 218-19; 402-03; *see also* AR 226-27 (assessing Plaintiff with chronic pain and lumbago and

26 indicating he was unclear as to why Plaintiff was being prescribed chronic narcotics).)   The ALJ's

27 finding that Plaintiff's subjective pain testimony was inconsistent with his treating physician's

28 opinion that narcotic pain medications were unnecessary to adequately address his pain was

1   therefore based upon the proper legal standards.  *See Trisdale v. Astrue*, 334 F. App'x 85, 87 (9th
2   Cir. 2009) (noting lack of a prescription for strong medication is incompatible with finding of
3   disability); *Jeter v. Comm'r of Soc. Sec. Admin.*, 76 F. App'x 809, 811 (9th Cir. 2003) (same).

4       The ALJ also highlighted inconsistencies in Plaintiff's testimony, noting Plaintiff had
5   reported inconsistent limitations in his reports to the agency and to the consultative examiners, and
6   had inconsistently testified to his ability to sit for long periods of time.  (AR 28-29.)  Plaintiff
7   contends "[t]he ALJ's misstatement of the reported activities in the function reports is primarily
8   what causes the identified inconsistencies, not [Plaintiff's] actual reports."  (Doc. 17, p. 16.)  A
9   review of the record, however, supports the ALJ's identification of inconsistencies in Plaintiff's
10  testimony.

11      Plaintiff presented varying testimony as to his daily activities between January and July of
12  2012: reporting to the agency on January 31, 2012, that he spends most of the day lying down
13  after waking up, only gets up to eat breakfast, speak on the telephone, or go to the bathroom, does
14  not prepare his own meals, do chores, do yardwork, or go shopping, goes outside "once in a
15  while," "never" spends time on the phone, and relies on his wife to remind him to "clean up"
16  (AR 152-54); yet reporting to consultative examiner Dr. Wagner on March 19, 2012, that he
17  engages in "light cooking and cleaning," shopping, walking for exercise, and performs his own
18  activities of daily living "without assistance" (AR 286) and later to consultative examiner Dr.
19  Dixit on March 26, 2012, that he "stays at home," is limited in his ability to perform household
20  chores, and can dress and bathe himself (AR 291); then reporting to the agency on July 12, 2012,
21  that he does not "move around very much at all," never cooks, never shops, never does household
22  chores or yardwork, goes outside "once in a great while," relies on his wife to remind him to
23  shower, occasionally talks on the phone and with visitors, and goes to church.  (AR 178-82.)  He
24  testified at the hearing, however, that he "stay[s] pretty close to [his] bed" all day, occasionally
25  goes shopping with his wife, and has no difficulty dressing (AR 417-21).  Plaintiff reported to the
26  agency on December 12, 2011, that he could not stand more than 10 minutes, sit more than 5
27  minutes, or lift more than 10 pounds at a time (AR 137), then testified at the hearing that he
28  doesn't know how long he can stand but it is "[p]robably not very long" and he doesn't have "very

1  much" trouble sitting but after a while his legs will "start hurting and they go to sleep on [him],"

2  and reported, for the first time, that he experiences difficulty with his fingers "get[ting] stuck"

3  about once a day (AR 417-421).

4      Plaintiff consistently reports far greater limitations to the agency than he does to the

5  consultative examiners.    Plaintiff contends such inconsistencies were "minor" and

6  "inconsequential" and are insufficient to discredit his subjective testimony.  (Doc, 17, pp. 16-18.)

7  While these multiple, minor inconsistencies between Plaintiff's reported activities of daily living

8  cited by the ALJ may not, in isolation, necessarily provide clear or convincing reasons for

9  discrediting Plaintiff, as discussed above, the ALJ articulated several other specific reasons that,

10 taken together, are sufficient to support his credibility assessment.

11     Finally, the ALJ also noted that

12          . . . [i]n a statement submitted to the [Social Security] Administration on
       December 12, 2011, [Plaintiff] denied side effects of medication.  In a function
13     report purportedly completed by [Plaintiff's counsel] on June 6, 2012, [Plaintiff]
       now reported drowsiness as a side effect of [his] medication.  No such side effects
14     have been reported to his physicians.

15 (AR 28 (internal citations omitted).)   As an ALJ may consider the side effect of a claimant's

16 medication use in the credibility analysis, Social Security Ruling[3] ("SSR") 96-7p, 1996 WL

17 374185, Plaintiff contends that the ALJ misstated the evidence (Doc. 17, p. 19).  In a residual

18 functional capacity assessment in February 2010, NP Schaaf noted Plaintiff experienced

19 "drowsiness & fatigue" with narcotic medication, and in December 2010, NP Schaaf noted no side

20 effects with medication.  (AR 31.)  In September 2011, Plaintiff told NP Schaaf that one kind of

21 Norco made him drowsy and he requested a different formulation.  (AR 228.)  Then, in his

22 statement to the agency in December 2011, Plaintiff reported taking no medications and therefore

23 experiencing no side effects of medication (AR 142), and then in June 2012, reported taking

24 medications for his stress and pain and experiencing drowsiness as a side effect of these

25 medications (AR 173).  Though Plaintiff is correct that there is some evidence in the record that

26

27 [3]   Social Security Rulings ("SSR") are final opinions and statements of policy by the Commissioner of Social
   Security, binding on all components of the Social Security Administration. 20 C.F.R. § 422.406(b)(1).  They are "to
   be relied upon as precedent in determining cases where the facts are basically the same."  *Paulson v. Bowen*, 836 F.2d
28 1249, 1252 n.2 (9th Cir. 1988).

1  Plaintiff did report experiencing drowsiness as a result of his medications, any error in the ALJ's

2  credibility analysis on the basis of the side effects of Plaintiff's medication is harmless because the

3  ALJ's credibility finding rested on several other grounds that, as discussed above, when taken

4  together, provide clear and convincing reasons supported by substantial evidence in the record.

5  *Batson*, 359 F.3d at 1197 (applying harmless error standard where one of the ALJ's several

6  reasons supporting an adverse credibility finding was held invalid); *Carmickle v. Comm'r of Soc.*

7  *Sec. Admin.*, 553 F.3d 1155, 1162 (9th Cir. 2008) (an error is harmless where there "remains

8  substantial evidence supporting the ALJ's conclusions on . . . credibility and the error does not

9  negate the validity of the ALJ's ultimate [credibility] conclusion") (internal citation and quotations

10  omitted) (alteration in original).

11       In sum, the ALJ's reasons were properly supported by the record and sufficiently specific

12  to allow the Court to conclude that the ALJ rejected the Plaintiff's testimony on permissible

13  grounds and did not arbitrarily discredit Plaintiff's testimony.

14  **B.      The ALJ's Consideration of the Medical Evidence**

15       Plaintiff contends the ALJ erred by adopting examining consultative physician Dr.

16  Wagner's opinion despite that it was not consistent with the overall record, by failing to

17  incorporate Plaintiff's use of a cane into the RFC assessment despite "numerous treatment

18  evidence indicating he used one to ambulate[,]" and by failing to discuss the opinion of PA

19  Cormier.   (Doc. 14, pp. 12-15.)   Defendant contends the ALJ properly evaluated the medical

20  evidence and properly assessed Plaintiff's residual functional capacity.  (Doc. 18, pp. 2-7.)

21       **1.      Dr. Wagner's Opinion Was Consistent with the Record**

22       The ALJ accorded great weight to consultative physician Dr. Wagner's opinion that

23  Plaintiff is capable of medium work, with limitations to stand and walk up to six hours in an eight

24  hour day, sit without limitation, lift or carry 25 pounds frequently and 50 pounds occasionally,

25  never climb or balance on ladders or scaffolds, and never work around heights or heavy

26  machinery.  (AR 29.)  The ALJ noted Dr. Wagner also opined that Plaintiff's capacity for "very

27  fine fingering" in his right hand "'might be slightly limited' by tremor" and that use of "a cane

28  may be necessary for long distances[,]" but did not adopt Dr. Wagner's restrictions regarding fine

fingering because no other medical provider had noted tremors and Plaintiff had 5/5 grip strength on examination.  (AR 29.)  Plaintiff contends the ALJ erred by finding Dr. Wagner's opinion consistent with the treatment evidence and objective findings of the record as a whole.  He argues that the evidence demonstrates symptoms of pain and limitations going back to March 2010, physician recommendations for a right knee arthroscopic surgery in June 2010 and indications Plaintiff would eventually need a total knee replacement, observations of decreased mobility, pain, crepitus, and stiffness in his knees, decreased range of motion, tenderness, and pain in his lumbar back, and use of a cane. (Doc. 17, p. 12.)  Plaintiff contends the ALJ failed "to explain how these numerous and consistent observations of limitations are consistent with a finding that [Plaintiff] is able to stand and walk six hours without use of a cane." (Doc. 17, pp. 12-13.)

Dr. Wagner observed Plaintiff was able to easily get up from a chair and walk a normal pace without assistance, carried a cane in his right hand but did not appear to lean on it heavily, sat comfortably through the entire history-taking part of the examination, was "very, very easily able to bend over at the waist and take off his shoes and put them back on," had 5/5 strength in all extremities and normal sensation, a negative straight leg raising test, had a normal gait and could walk on heels and toes, and had mild crepitus in his knees with the examination otherwise normal. (AR 29; 286-87.)  Although Plaintiff reported using a cane "at times," he "appeared to be stable walking without the cane" at the examination.  (AR 286.)   The ALJ found these findings consistent with the overall record, which demonstrated minimal objective findings in imaging (*see* AR 25; 218 (x-ray of lumbar spine revealed no abnormalities); 281-84 (MRI studies of Plaintiff's bilateral knees demonstrating mild findings), Plaintiff's repeated election not to have arthroscopic surgery because he preferred to wait unless the pain became unbearable, because the surgery would be more beneficial when he was older and he was scared (*see* AR 25; 27; 210; 266; 402), Plaintiff's normal gait, range of motion, and presentation without use of a cane (*see* AR 25-27; 228-30; 231; 233; 260; 266; 270-71; 402-03), repeated appearance on examination in "no acute distress" despite contemporaneous allegations of serious pain (*see* AR 25-27; 218; 227-75; 279; 360-95; 402-03), and repeated assessments that Plaintiff was not a "fall risk" requiring use of an assistive device (*see* AR 31; 303; 306; 374; 380; 396).

1    Dr. Wagner's opinion was affirmed by state agency medical consultant Dr. Fast, who

2  determined Plaintiff had the RFC to perform medium work with frequent postural movements.

3  (AR 301.)  Plaintiff contends that because Dr. Fast's opinion was formed in April 2012, and he

4  lacked "nearly a year's worth of more recent records that showed fairly consistent observations of

5  limping, use of a cane, and pain and decreased range of motion in the back and knees[,]" Dr.

6  Fast's opinion cannot be relied upon to support Dr. Wagner's assessment.  (Doc. 17, p. 13.)

7  However, state agency medical consultant Dr. Kiger also reviewed the record in August 2012, and

8  had the benefit of further records and functional capacity assessments from Plaintiff's treating

9  nurse practitioner.  (AR 347-48; 349-50.)  Dr. Kiger affirmed Dr. Fast's opinion that a medium

10  RFC was appropriate and specifically opined that there were "no new findings to support the

11  necessity for a cane."  (AR 347-48.)

12    Subsequent to Dr. Kiger's assessment, which affirmed Dr. Fast's opinion supporting Dr.

13  Wagner's assessment, the only treating records are those of NP Schaaf, Dr. Krishnamoorthi, and

14  PA Cormier.  (*See* 30; 360; 365-75; 399-400.)  These medical sources generally observed that

15  Plaintiff complained of "mild" pain, had a "limping gait," presented using a cane, and exhibited

16  decreased range of motion in his back and knees.  (*Id.*)  These are not new, significant findings

17  appearing for the first time in the treating record.  Therefore, the fact that Drs. Wagner and Fast

18  did not review these redundant records is inapposite to whether Dr. Wagner's medium RFC

19  assessment was supported by substantial evidence in the record, as discussed above.  The ALJ

20  properly assessed Dr. Wagner's medical opinion as consistent with and supported by the overall

21  record.

22    **2.    The ALJ Did Not Err by Omitting Plaintiff's Subjective Use of a Cane in the
23           RFC Assessment or in the Hypothetical Questions Posed to the VE**

24    Plaintiff asserts the ALJ erred by disregarding Plaintiff's used of a cane "in the light of the

25  high exertional demands required of medium level work[.]"  (Doc. 17, p. 14.)  Plaintiff notes he

26  was repeatedly observed using a cane to ambulate, limping, and walking with a slow gait, Dr.

27  Wagner specifically opined he may need a cane to walk long distances, and NP Schaaf explicitly

28  opined he required a cane to ambulate and experienced pain with standing too long, and contends

the ALJ's failure to make any findings as to whether Plaintiff would need to use a cane in the workplace and failure to provide any explanation for the omission of his use of a cane from the RFC was harmful error.  (Doc. 17, p. 14.)

Defendant contends that "although [Plaintiff] may have used a cane at times, there was no evidence that it was medically necessary" and therefore "there was no need to include [Plaintiff]'s subjective use of a cane in his [RFC] finding or in the hypothetical questions to the [VE]."  (Doc. 18, p. 6.)

Use of a medically-required hand-held assistive device is a nonexertional limitation that may significantly restrict a claimant's RFC and the occupational base, even if it not disabling *per se*.  *See, e.g.*, SSR 96-9p, 1996 WL 374185, at *7 ("[A]n individual who must use a hand-held assistive device to aid in walking or standing because of an impairment that affects one lower extremity (*e.g.*, an unstable knee), or to reduce pain when walking, who is limited to sedentary work because of the impairment affecting the lower extremity, and who has no other functional limitations or restrictions may still have the ability to make an adjustment to sedentary work that exists in significant numbers.  On the other hand, the occupational base for an individual who must use such a device for balance because of significant involvement of both lower extremities (*e.g.*, because of a neurological impairment) may be significantly eroded").

SSR 96-9p provides that "[t]o find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (*i.e.*, whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information).  The adjudicator must always consider the particular facts of a case."  SSR 96-9p, 1996 WL 374185, at *7.  *See also Tripp v. Astrue*, 489 F. App'x 951, 955 (7th Cir. 2012) (proof of the medical necessity of a cane "require[s] an unambiguous opinion from a physician stating the circumstances in which an assistive device is medically necessary"); *Howze v. Barnhart*, 53 F. App'x 218, 222 (3d Cir. 2002) (same).

Here, Plaintiff has not cited any medical evidence supporting the use of a cane.  (*See* Doc. 17.)  Though Plaintiff is correct that the record is replete with references to his use of a cane,

1 those mentions are all traceable to Plaintiff's self-reports and to his medical sources' observations

2 that he presented with an assistive device.  There is no medical documentation establishing the

3 need for an assistive device.  (*See* AR 25-27; 228-30; 231; 233; 260; 266; 270-71; 402-03 (noting

4 Plaintiff's normal gait, range of motion, and presentation without use of a cane); AR 31; 303; 306;

5 374; 380; 396 (repeated assessments that Plaintiff was not a "fall risk" requiring use of an assistive

6 device).)  Moreover, neither Plaintiff nor counsel discussed or argued about the use of a cane at

7 the hearing.  (*See* AR 411-29.)

8        Further, Plaintiff has admitted in adult function reports that though he uses a cane "all the

9 time," he has never been prescribed one by a doctor.  (AR 158 (January 2012 adult function report,

10 noting he "was told to get a cane by [his] doctor" but admitting no physician had actually

11 prescribed an assistive device); 184 (July 2012 adult function report, noting he bought a cane

12 because his physician "told [him] to buy one because [he] ke[pt] grabbing on everything" to

13 balance" but admitting no physician had actually prescribed an assistive device).)  This Court's

14 review of the medical record reveals that no acceptable medical source has opined that a cane is a

15 medical necessity for Plaintiff.[4]  To the contrary, examining physician Dr. Wagner observed

16 Plaintiff walked stably without use of a cane and opined Plaintiff could walk and stand for six

17 hours out of an eight-hour day and can sit without restriction (AR 286) and consulting physician

18 Dr. Kiger concluded there were no findings supporting the necessity for a cane (AR 347-48); *see*

19 20 C.F.R. §§ 404.1527(f)(2)(i) (state agency physicians are considered "highly qualified

20 physicians who are also experts in Social Security disability evaluation"), 416.927(f) (2)(i) (same);

21 *see also* SSR 96-6p, 1996 WL 374185.

22        Plaintiff has also failed to cite any unambiguous medical opinion describing the

23 circumstances for which the use of a cane would be needed pursuant to SSR 96-9p.  (*See* Doc. 17.)

24 The only credited physician to suggest any restriction was Dr. Wagner, who opined that Plaintiff

25

26 [4]  The Court notes that NP Schaaf opined Plaintiff required use of a cane to ambulate; however, her opinion was
properly discredited by the ALJ as both an unacceptable medical source and because her opinions were conclusory,
27 contradictory, and inconsistent with her treatment notes.  (AR 30-32.)  Plaintiff does not contest that NP Schaaf's
opinion was properly discredited.  (*See* Doc. 17.)  Therefore, there is no acceptable medical source in the record who
28 has opined Plaintiff requires the use of an assistive device.

1   *may* require use of a cane "for long distances." (AR 289.)  Dr. Wagner's statement, however, is

2   not an opinion on Plaintiff *current* functional limitations and is completely ambiguous as to

3   Plaintiff's *potential* functional limitation in the ability to walk "for long distances."  The ALJ was

4   not required to accept and incorporate into his RFC assessment every potential functional

5   limitation, only those unambiguous functional limitations for which substantial evidence existed in

6   the record.  *Rounds v. Comm'r of Soc. Sec.*, 807 F.3d. 996, 1006 (9th Cir. 2015) (citing *Carmickle*,

7   533 F.3d at 1165) ("An ALJ may rationally rely on specific imperatives regarding a claimant's

8   limitations, rather than recommendations").

9          As discussed above, no doctor ever indicated Plaintiff had a medical necessity to use an

10  assistive device (*see* AR); Drs. Wagner and Kiger specifically noted Plaintiff did not need such a

11  device (AR 286 (noting Plaintiff reported using a cane "at times" but "appeared to be stable

12  walking without the cane" at the examination, was able to easily rise from his chair, sat

13  comfortably, bent easily at the waist, and did not lean on the cane heavily despite that he carried it

14  in his right hand); 347-48 (concluding based on the record there were "no new findings to support

15  the necessity for a cane" and adopting a medium RFC); and neither Plaintiff nor counsel discussed

16  or argued about the use of a cane at the hearing (AR 411-29).  The medical record adequately

17  establishes that Plaintiff's cane was not medically necessary.  *See, e.g., Verduzco v. Apfel*, 188

18  F.3d 1087, 1088 (9th Cir. 1999) (ALJ did not err in rejecting plaintiff's allegation that he needed a

19  cane because (1) "none of his doctors had ever indicated that he used or needed to use an assistive

20  device in order to walk"; (2) two doctors specifically noted that the claimant did not need such a

21  device; and (3) when asked for his driver's license during the hearing, plaintiff "stood up swiftly

22  and took out his wallet from his rear pocket without effort and without apparent discomfort,"

23  despite walking slowly and using a cane during the hearing).  *See also Tripp*, 489 F. App'x at 955

24  (absent "medical documentation establishing the need for a hand-held assistive device to aid in

25  walking and standing and describing the circumstances for which it is needed" no limitation need

26  be incorporated into the RFC); *Martinez v. Astrue*, 316 F. App'x 819, 826 (10th Cir. 2009) (same).

27  The ALJ did not err by omitting from the RFC assessment an unsupported restriction to the use of

28  or reliance upon an assistive device.

Plaintiff also contends the ALJ erred by failing to incorporate his use of a cane into the hypothetical question posed to the VE.  (Doc. 17, p. 20-21.)  As discussed above, the ALJ properly assessed Plaintiff's RFC without incorporating an unsupported restriction to the use of or reliance upon a cane.  "Without objective medical evidence that [Plaintiff] needed a cane[,] and in light of the ALJ's findings with respect to [Plaintiff]'s lack of credibility, there was no reason to include [Plaintiff]'s subjective use of th[at] device[ ] in the hypothetical to the VE." *Thomas v. Barnhart*, 278 F.3d 947, 959-60 (9th Cir. 2002) (citing *Copeland v. Bowen*, 861 F.2d 536, 540-41 (9th Cir. 1988)); *see also Magallanes v. Bowen*, 881 F.2d 747, 756-57 (9th Cir. 1989) (holding that it is proper for an ALJ to limit a hypothetical to restrictions supported by substantial evidence in the record).  The ALJ therefore did not err by relying on testimony the VE gave in response to hypotheticals that did not incorporate Plaintiff's subjective use of a cane.

### 3. The ALJ's Failure to Discuss PA Cormier's Opinion Was Inconsequential to the Ultimate Disability Finding and therefore Harmless

It is undisputed that the ALJ did not discuss PA Cormier's opinion that Plaintiff should avoid kneeling and squatting.  (*See* AR 25-32.)  Plaintiff contends this is harmful error because the ALJ included a limitation to "frequent postural" in his RFC assessment and PA Cormier's opined functional limitations were significantly "more extensive."  (Doc. 17, p. 15.)  Defendant suggests that "[i]n all likelihood, the ALJ did not see the recommendations as functional limitations" and asserts that regardless, the error was arguably harmless because Plaintiff would still be capable of performing the requirements of the jobs identified by the VE.  (Doc. 18, p. 7.)

To reject the testimony of a medically acceptable treating source, the ALJ must provide specific, legitimate reasons based on substantial evidence in the record.  *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (citing *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009).  Because physician's assistants are defined as "other sources," 20 C.F.R. § 404.1513(d), they are not entitled to the same deference, *see* § 404.1527; SSR 06-03p, 2006 WL 2329939, and their testimony may be properly discounted if the ALJ "'gives reasons germane to each witness for doing so[,]'" *see Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1224 (9th Cir. 2010) (quoting *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001)).  Here, however, the ALJ did

1   not provide germane reasons for discounting PA Cormier's opinion.  (AR 25-32.)  Therefore, in

2   order to conduct a harmless error analysis, the Court must fully credit PA Cormier's opinion that

3   Plaintiff is restricted from kneeling or squatting (AR 362; 379) and then determine whether the

4   ALJ's error in not discussing PA Cormier's opinion was dispositive to the ultimate finding that

5   Plaintiff was not disabled.  *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055 (9th Cir.

6   2006) (where the ALJ's error lies in a failure to properly discuss competent lay testimony

7   favorable to the claimant, a reviewing court cannot consider the error harmless unless it can

8   confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have

9   reached a different disability determination).  Here, even fully credited, PA Cormier's opinion was

10  inconsequential to the determination that Plaintiff could perform the requirements of work existing

11  in substantial numbers in the local economy, and, therefore, the ALJ's error in failing to discuss

12  PA Cormier's opinion was harmless.

13      In assessing Plaintiff's RFC, the ALJ, in accordance with Social Security terminology, *see,*

14  *e.g.*, SSR 85-15, 1985 WL 56857, *7, used the term "crouch" rather than "squat."  (AR 24.)

15  However, this is inconsequential because the terms are essentially synonymous.  *Chavez v. Astrue*,

16  699 F. Supp. 2d 1125, 1133 n.5 (C.D. Cal. 2009) (citing Merriam-Webster's Collegiate

17  Dictionary, 1138 (10th ed. 2002) (defining "squat" as "to cause (oneself) to crouch or sit on the

18  ground"); *Filimoshyna v. Astrue*, No. CIV S-08-2131-GGH, 2009 WL 3627946, *8 (E.D. Cal.

19  Oct. 29, 2009) ("Squatting is most similar to the term 'crouching' as used in the [Social Security]

20  rulings."); *and Stewart v. Astrue*, No. 08-5017-CV-REL-SSA, 2009 WL 537538, *18 (W.D. Mo.

21  Mar. 4, 2009) ("'Squat'" means "'to sit in a low or crouching position with the legs drawn up

22  closely beneath or in front of the body.'"  (internal citation omitted))).  Therefore, the relevant

23  inquiry is whether PA Cormier's restrictions to *no kneeling* and *no crouching* (AR 367; 379)

24  preclude Plaintiff from performing the requirements of the three representative occupations

25  identified by the VE and relied upon by the ALJ in finding Plaintiff not disabled at Step 5.

26      The DOT description for the job of kitchen helper, DOT 318.687-010, does not require

27  kneeling but does require frequent crouching.  Plaintiff would therefore be unable to perform the

28  requirements of work as a kitchen helper under a postural limitation to never squat.  The DOT

1  description for the job of cleaner, DOT 919.687-014, does not require crouching but does require

2  occasional kneeling.  Under a postural limitation to never kneel, Plaintiff would be unable to

3  perform the requirements of work as a cleaner.  However, the DOT description for the job of

4  laundry worker, DOT 361.685-018, requires no kneeling and no crouching.  Therefore, Plaintiff

5  would be able to perform the requirements of work as a laundry worker.  Because the VE testified

6  that Plaintiff could perform one of 6,000 such jobs in the state of California (AR 33; 426),

7  substantial evidence supports the ALJ's finding that Plaintiff was "not disabled."  *Thomas v.*

8  *Barnhart*, 278 F.3d 947, 960-61 (9th Cir. 2002) (finding 1,300 jobs in the state and 622,000 jobs

9  in the national economy to be sufficient to support a nondisability determination); *Moncada v.*

10  *Chater*, 60 F.3d 521, 524 (9th Cir. 1995) (finding 2,300 jobs in the county and 64,000 nationwide

11  to be sufficient to support a nondisability determination); *Barker v. Sec'y of Health & Human*

12  *Servs.*, 882 F.2d 1474, 1478-79 (9th Cir. 1989) (citing with approval decisions finding less than

13  500 regional jobs "significant" for purposes of determining a plaintiff's residual functional

14  capacity).  The ALJ's error in failing to discuss PA Cormier's opined functional limitation as to

15  Plaintiff's ability to kneel or squat was therefore harmless.

16      In sum, the ALJ did not err in omitting Plaintiff's subjective use of a cane from the RFC

17  assessment or hypotheticals to the VE and the ALJ's error in failing to assess PA Cormier's

18  opined functional limitations was harmless.

19                                   **CONCLUSION**

20      Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial

21  evidence in the record as a whole and is based on proper legal standards.  Accordingly, the Court

22  DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social

23  Security.  The Clerk of this Court is DIRECTED to enter judgment in favor of Carolyn W. Colvin,

24  Acting Commissioner of Social Security, and against Plaintiff Joe Preciliano Flores.

25

26  IT IS SO ORDERED.

27  Dated:  __**May 10, 2016**__                          _____**/s/ Sheila K. Oberto**
                                                          UNITED STATES MAGISTRATE JUDGE

28